Alexander Del Giorno, J.
This is an action brought by the claimant to recover the sum of $2,145.74 for damages sustained because of the alleged negligence and misfeasance of the State of New York, its agents and employees.
On the afternoon and evening of August 12, 1955 and during the morning hours of August 13,1955 surface water undermined and destroyed a section of Bonnie Heights Boad in the village at a point near its intersection with Port Washington Boulevard, for a distance of 75 feet and to a depth of approximately 8 feet, carrying away sections of drainpipes or culverts which passed under the road at that point. This surface water also destroyed and washed away a section of Stonytown Boad at its intersection with Manhasset Woods Boad in the village for a distance of 166 feet and to a depth of 10 to 15 feet.
On September 23, 1953 the State entered into a contract for reconstruction of a portion of North Hempstead Turnpike, under Contract FABC 53-110 and for constructing a portion of Old Middle Neck Boad, under Contract SS 53-13, with drainage and miscellaneous work, affecting parts of Flower Hill. The record plan shows the work as actually laid down. The State accepted the installation at its completion on August 9, 1954.
A map of the Village of Flower Hill was offered in evidence and marked claimant’s Exhibit 5. For the purpose of identifying certain points, this map was used throughout the trial, the various points being designated by alphabetical letters.
Prior to 1953, about 800 acres made up the watershed area, which were drained by the then existing drainage installations in the village of Flower Hill. Some of the surface water flowed northerly, from the southerly boundary of the village at Northern Boulevard and Middle Neck Boad along the gutters and roadway of Middle Neck Boad to its intersection with Port Washington Boulevard, Point “ 0 ” on this map indicates *681 material overflow basins into which some of the water ran, and any excess flowed on northerly through an open brook which went through a pipe under Farm View Road to point “E”, where it entered a 3 foot x 3 foot box culvert and passed under Port Washington Boulevard, emptying into the open ditch at point “ Gr ”, where the 1953-1954 State installation ended. There was a notation to the effect that the excavation was to be made by others. It then continued to flow in the open ditch for about 1,000 feet through two 30-inch culverts under Bonnie Heights Road at point “ H ”. The open ditch then continued to Man-hasset Woods Road near its intersection with Stonytown Road, through the culvert there and on out to Leeds Pond and Man-hasset Bay.
Prior to 1953 there were no covered drainage installations other than the 3 foot x 3 foot box culvert under Port Washington Boulevard and the pipe leading to it from Farm View Road, and the pipes at points “ J” and “K” leading into the open ditch, except the culverts under Bonnie Heights and Manhasset AVoods Roads.
In 1953-1954 the State constructed and installed an underground drainage system which entered the village at its southerly boundary at the intersection of Northern Boulevard and Port AArashington Boulevard, proceeding through the village through the latter for about 4,300 feet and then crossing the westerly side of Port Washington Boulevard on an angle for about 100 feet, emptying into an open culvert or brook. A 72-inch drain under Port Washington Boulevard, replacing the 3 foot x 3 foot box culvert, was part of this installation. Claimant’s witness Ward characterized the installation as one of “ pipes and drains throughout the area to carry and transport the water previously referred to as existing surface water prior to 1953-1954.” He stated that by reason of this installation an increase of 40% of watershed area outside the village (Roslyn Heights, South of Northern Boulevard) was hooked up to the covered drains so installed and transported to point “ Gr ”, from where water was dropped into the open ditch 1,000 feet south of the existing 30-inch Bonnie Heights Road culverts, with no further provision by the State for its continued disposition. This outside water was collected by a series of pipes outside the village, all of which are then siphoned off into the pipeline which passes through the village. This water is supplemented by a connection with a County of Nassau drain connecting with the State drain at Middle Neck Road and Port Washington Boulevard, some 1,500 feet before the drain crosses the Port Washington Boulevard and empties into the culvert or brook.
*682 On August 12 and 13, 1955 the claimant asserts that such great quantities of water were picked up by this drainage system and emptied into the ditch that it overflowed the banks, undermining and destroying part of Bonnie Heights Boad, and continued to Stonytown Boad at its intersection with Manhasset Boad, where it destroyed and washed away a section of Stony-town Boad.
The witness Ward, a licensed engineer who was also the village adviser on engineering matters, stated that the new installation at point £ £ G ” was inadequate to take care of the water deposited there, because there was a greater volume of water arriving there than could be taken away.
The State engineer in charge of the 1953-1954 drainage installation admitted that connections were made to pick up and carry water from watershed areas outside the village, in addition to picking up other existing but unconnected drains in the village, all of which water was transported to point ££ G ” and dropped in the open ditch. He testified as to the engineering details of the baffle and headwall installed by the State, stating that the State put in a 72-inch pipe and then left it open at point “ G ”, using the existing earth bank as a baffle, and admitting the installation £ £ was not beneficial to proper drainage that the contract ended at point ££ G ” and that there was a notation on the plan which stated that the excavation was to be made by others; that although a much greater quantity of water would have to be handled at that point, the contract made no further provision for it; that further excavating of the ditch ££ was necessary to be done in order to provide free flowage of water ”, but that££ there was no money provided to go on to do this ’ ’; and that the State is now digging this channel so that the water will flow freely from the end of the pipe at point “ G ”. He conceded that if he had had complete control of the earth bank at point £< G” and continuing to point ££H” he would not have stopped where they did, but would have excavated. No survey was made as to the open ditch from point £ £ G ” through point£ £ H ” and point£ ‘ I ”; no survey was made as to the adequacy of the 30-inch culverts under Bonnie Heights Boad or Manhasset Woods Boad; no survey was made of the watershed area outside of the village. He said that now under the present State improvement plan, including drainage of the same area, a 72-inch culvert is being installed under Bonnie Heights Boad to replace two 30-inch culverts which were washed out in 1955.
Prior to the installation under the contract involved herein, the pipes under Bonnie Heights Boad had been maintained by *683 the village for many years. The construction of private homes in the village had increased a great deal with the building of sidewalks, streets and driveways.
On August 12 and 13, 1955 ‘ ‘ Hurricane Connie ’ ’ occurred, and a rainfall of 8.2 inches was recorded at nearby Mineóla. It was at this time that the village property was damaged. The village clerk stated that prior to August 12, 1955 there had been no overflow.
The clerk of the village did admit, however, that prior to the installation of the State drain, every storm that occurred resulted in a washing out to a small degree of Stonytown Road and Manhasset Woods Road, or the shoulder of the roads, although no flooding condition was caused until the present installation. He described such a washing out as an occasional small ponding, and stated that never in 30 years had it come up over the road.
The State attempted to indicate that the work which was finished by it at a certain location was supposed to be continued by the County of Nassau, but the Attorney-General admitted that he could introduce no proof that the county was supposed to continue the work. Nor did the State interplead the County of Nassau in any effort to prove such contention.
It was the obligation of the State to install proper drainage along the area of Port Washington Boulevard, which is a State road. The proof indicates that the State constructed an inadequate facility for the collection and disposal of surface water in the area affected. The State should have had a survey made both of the watershed area lying outside the village and of the existing open ditch and performed its operation accordingly. (Logan v. State of New York, 162 Misc. 793, affd. 254 App. Div. 410.) The circumstances existing at the time of the installation indicated the necessity of these surveys. The exercise of reasonable prudence would have disclosed to the State’s engineers what might be expected to occur in the future.
Although it is true that the State cannot be placed in the position of an insurer in an installation such as that which is involved herein, nevertheless it has a duty in its maintenance of highways to guard against such dangers as could or ought to have been anticipated or foreseen in the exercise of reasonable prudence and care. (Snowden v. Town of Somerset, 171 N. Y. 99; Garrette v. State of New York, 197 Misc. 842.) A survey of the watershed area outside the village and of the existing open ditch would have indicated what might have been expected to occur at the time of a storm. For the State, by its engineer, to admit as it did that further excavation of the ditch *684 was necessary in order to provide free flowage of water and then to seek to excuse the State’s failure to do so by saying that the State had not provided the money to do this, certainly is not an impressive argument in favor of the State’s contention that it was guilty of no negligence. (Logan v. State of New York, supra.)
The State would disclaim all responsibility for the damage upon the ground that it could not foresee an unprecedented rainstorm, a hurricane, an act of God, and that the storm which occurred on August 12 and 13, 1955, constituted all three of these. Having received the official appellation of 1 ‘ Hurricane Connie ”, the storm was of course a severe rainstorm and a hurricane. The court feels, however, that it did not constitute an act of God for which the State cannot be held accountable. (Mennito v. Town of Wayland, 56 N. Y. S. 2d 654.) In that case, the town was seeking to evade liability for damage caused by surface waters overflowing from a drainage installation, there being no adequate outlet, by contending that the storm of 1941 was so unprecedented and unpredictable as to constitute an act of God for which the town could not be held accountable. The court overruled this contention, citing Woodruff v. Oleite Corp. (199 App. Div. 772, 773): “ The act of God, which exempts from liability, is something which operates without any aid or interference of man, and when the loss occasioned is the result in any degree of human aid, or interference, or if an act of human negligence contributed to the injury, or, though the injury proceed directly from natural causes, if it might have been avoided by human prudence and foresight, it cannot be considered the act of God.” Here, the State might reasonably have anticipated the condition that arose, and made proper provision to guard against it. Even if an act of God occurs, and it is not the direct proximate cause of the failure to perform but is only a contributing cause in connection with the negligence of the defendant, the latter is liable for resultant damage.
The court finds that in the installation of 1953-1954, the State was guilty of negligence which constituted the proximate cause of the damages sustained herein by the Village of Flower Hill.
The court finds that the village was damaged in the sum of $2,000 and decides that the claimant is entitled to judgment in the sum of $2,000, with interest thereon from September 14,1955.
This memorandum constitutes the decision of the court in accordance with the provision of section 440 of the Civil Practice Act.
The findings submitted have been passed upon.
Let judgment be entered accordingly.